United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOSEPH MINIACE,

Plaintiff,

v.

PACIFIC MARITIME ASSOCIATION,

Defendant.
_______________________________________/

PACIFIC MARITIME ASSOCIATION, et al.,

Counterclaimants and Cross-Claimants,

vs.

JOSEPH N. MINIACE; JEANNETTE COBURN; MICHAEL E. CORRIGAN; BENMARK, INC.; CORRIGAN & COMPANY; and BENMARK WEST,

Counterdefendant and Cross-Defendants.
_______________________________________/

No. C 04-03506 SI

**ORDER GRANTING PMA'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART MINIACE'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING IN PART COBURN'S MOTION FOR SUMMARY JUDGMENT**

On December 9, 2005, the Court heard argument on three related motions: a motion for partial summary judgment by defendant Pacific Maritime Association ("PMA") against plaintiff Joseph Miniace; Miniace's motion for partial summary judgment against PMA and Maritech Corporation; and cross-defendant Jeanette Coburn's motion for partial summary judgment against PMA and Maritech. Having carefully considered the arguments of counsel and the papers submitted, and for good cause appearing, the Court hereby GRANTS PMA's motion in its entirety, GRANTS IN PART Miniace's motion, and GRANTS IN PART Coburn's motion.

**BACKGROUND**

Defendant and counterclaimant PMA is a "nonprofit mutual benefit corporation" organized and existing under California law. Second Am. Counterclaims and Cross-Claims, ¶ 1; Decl. of Linda Q. Foy in Support of PMA Mot. ("Foy Decl."), Exh. 1 at ¶ 3. PMA' s members consist of maritime shipping carriers, maritime terminal operators, and stevedore companies that service ports on the West Coast of the United States. Foy Decl., Exh. 1 at ¶ 3. PMA's principal function is to negotiate and administer collective bargaining agreements that govern the workers employed by its member companies. *Id.* PMA is governed by a Board of Directors that consists of senior executive officers from its member companies. *Id.* at ¶ 4.

On May 1, 1996, PMA hired Joseph Miniace as its new President. Second Am. Counterclaims and Cross-Claims, ¶ 3; Foy Decl., Exh. 2. Miniace joined an executive team that included Thomas McMahon, PMA's Chief Financial Officer. Foy Decl., Exh. 7 at ¶ 4. Miniace served as PMA's President until March 17, 2004, when he was terminated by PMA, purportedly for cause. Foy Decl., Exh. 4; Foy Decl., Exh. 6 at ¶ 4; Decl. of James McKenna in Support of PMA Mot. ("McKenna Decl."), ¶ 5. Miniace's termination, and events related to it, are the grounds for this litigation.

**I. Miniace's Termination**

Miniace's termination was put in motion in early March 2004, when PMA's Board was advised that its senior executives, including Miniace and McMahon, had received benefits that had not been formally disclosed to the Board. *See* Foy Decl., Exh. 6 at ¶ 5; Foy Decl., Exh. 13 at ¶ 5. In response, PMA's Board hired a private attorney, John C. Cook, to investigate the matter. Foy Decl., Exh. 13 at ¶ 6; Conf. Decl. of John C. Cook in Support of PMA Mot. ("Conf. Cook Decl."), ¶ 3. Cook reported his findings to the Board on March 17, 2004, and issued another report on April 14, 2004. Conf. Cook Decl., ¶ 4; Conf. Decl. of William H. Orrick in Oppo. to PMA Mot. ("Conf. Orrick Decl."), Exh. D at 57; Conf. Decl. of Glenn M. Levy in Support of PMA Mot. ("Conf. Levy Decl."), Exh. 8 at 9; Foy Decl., Exh. 13 at ¶ 5. His investigation revealed a number of benefits that Miniace and others had received without formal Board approval. Conf. Cook Decl., Exh. A at ¶¶ 3-6; Conf. Levy Decl., Exh. 8 at 7-9. These benefits are not in dispute. *See* Conf. Levy Decl., Exh. 6 at PMA 61-64 (document that

United States District Court
For the Northern District of California

Miniace provided to PMA Board summarizing benefits).

**A. Secured Executive Benefit Plan**

Shortly after Miniace started at PMA, he implemented a "Secured Executive Benefit Plan" ("SEBP") for PMA's senior executives. Foy Decl., Exh.9. According to Miniace, the plan was created to provide retiring executives with a retirement benefit equivalent to 66% of their salary. Conf. Levy Decl., Exh. 5 at 10 (Miniace Claim for Severance Pay). On November 14, 1996, Bradley Mulholland, a member of PMA's Board, signed a resolution authorizing the creation of the SEBP. Conf. Orrick Decl., Exh. 70. Miniace asked Michael Corrigan, an insurance agent and close personal friend of McMahon, to create the policy. Foy Decl., Exh. 8 at 22-23, 33-34, 45-46; Conf. Levy Decl., Exh. 18. On December 5, 1996, Miniace and McMahon signed documents that established the SEBP. Foy Decl., Exh. 9. McMahon was named as administrator of the SEBP. *Id.*

The SEBP was implemented as a "reverse split-dollar" policy. Foy Decl., Exh. 8 at 45-46, 51-52. Under the plan, PMA would purchase life insurance for its senior executives and would make payments exceeding the actual cost of the insurance. Foy Decl., Exh. 10 at 46-49. The excess payments resulted in a rapid build-up of cash value, which was then invested to fund retirement benefits for retiring executives. *Id.* If a covered executive died before retirement, the death benefit of the policy would be split between PMA and the executive's heirs. The executive's heirs would receive the "accumulated value" of the policy – the cash contributions in excess of the cost of insurance combined with the earnings on those contributions. Foy Decl., Exh. 9. PMA, on the other hand, would receive the "recoverable amount" from the insurance proceeds, defined as the total death benefit of the insurance policy less the "accumulated value." *Id.* Given the large amounts of insurance that PMA purchased for its executives through the SEBP, the "recoverable amount" was significantly greater than the "accumulated value." For example, a document provided by Corrigan to McMahon in 1998 showed that if McMahon had died in 1998, the life insurance purchased under the SEBP would yield an approximate death benefit of $13.3 million, $188,000 of which was "accumulated value" payable to McMahon's wife, and the remaining $13.1 million of which would be payable to PMA. Conf. Levy Decl., Exh. 19; Foy Decl., Exh. 8 at 172-73. PMA's contributions to this scheme were substantial; from 2000 to 2003

PMA contributed approximately $160,000 per year to Miniace's SEBP, almost half of his base salary. Conf. Levy Decl., Exh. 6 at PMA 00061.

In 2002, the IRS issued Revenue Notice 2002-8 which for the first time allowed employee participants to receive the "recoverable amount" under the policy, rather than the employer. Decl. of Susan J. Harriman in Support of Coburn Mot. ("Harriman Decl."), Exh. 39; Harriman Decl., Exh. F at 128-132. Later in 2002, McMahon revealed to Miniace that he was terminally ill with cancer. Foy Decl., Exh. 8 at 124-25. In response, Miniace and McMahon thereafter met with Corrigan, PMA's insurance agent, to discuss amending the SEBP. *Id.* at 126, 131 Miniace and McMahon later executed an amendment to McMahon's SEBP policy, providing that in the event of his death McMahon's beneficiary would receive the bulk of the policy's death benefit, while PMA would recover its premiums. Foy Decl., Exhs. 11, 12. These amendments were backdated to January 15, 2002, because they needed to occur before a "drop-dead" date in order to be effective. Foy Decl., Exh. 8 at 130, 158-59. Miniace admits that he executed this amendment without discussing it with the Board. *Id.*, Exh. 3 at 191. He contends that he had authority to execute the amendment, however, because the original intent of the SEBP was to benefit the employee, and he was bringing McMahon's policy into compliance with that intent. *Id.*

McMahon died on May 3, 2002. His wife, Jeannette Coburn, received over $10.1 million in death benefits, while PMA received $986,383. Foy Decl., Exh. 5 at ¶ 26; Exh. 7, at ¶ 28. It is undisputed that these figures would have been reversed had the amendment not been executed.

**B. Maritech Director's Fees**

Maritech is a wholly-owned, for-profit subsidiary of PMA. Decl. of Craig E. Epperson in Oppo. to Coburn and Miniace Mot. ("Epperson Oppo. Decl."), ¶ 8. It was incorporated in Nevada in 1998 to perform payroll processing for PMA and other companies. *Id.* at ¶¶ 5-9. Maritech's Board of Directors was initially comprised of three officers from PMA: Miniace, McMahon, and Craig Epperson, PMA's General Counsel. *Id.* at ¶ 11. At a January 27, 2000, Board meeting at which they were the only directors present, Miniace and McMahon voted to pay Maritech's directors and officers a $25,000 bonus

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

per Board meeting.[1] *Id.*; Conf. Decl. of Susan Harriman in Supp. of Coburn Mot. ("Conf. Harriman Decl."), Exh. N. Maritech's directors and officers continued to receive this fee for attending Board meetings throughout 2001, 2002, and 2003. Conf. Harriman Decl., Exhs. O, P; Conf. Levy Decl., Exh. 6 at PMA 61-64. PMA's Board members were not told of the director's fee until 2004. Decl. of Jon Hemingway in Oppo. to Coburn Mot. ("Hemingway Oppo. Decl."), ¶ 6.

**C. Other Benefits**

Miniace's offer letter stated that he was entitled to the following non-monetary benefits: a leased company car equivalent to a Buick Le Sabre; membership in one "luncheon club" in San Francisco; and participation in "PMA's health and welfare, retirement, disability and life insurance plans." Decl. of Glenn M. Levy in Oppo. to Coburn Mot. ("Levy Oppo. Decl."), Exh. 66. Similarly, McMahon's offer letter stated that he was entitled to "a company car and the customary benefit plans – life insurance, health and dental, long-term disability and pension." Conf. Decl. of Glenn M. Levy in Oppo. to Coburn Mot. ("Conf. Levy Oppo. Decl."), Exh. E. In early 2002, however, Miniace took out long-term care insurance[2] policies that covered himself, McMahon, and Epperson, at a total cost of over $240,000 in the form of a one-time premium. Conf. Levy Oppo. Decl., Exh. 6, at PMA 00061-63; Conf. Decl. of Bettye Page-Wilson in Oppo. to Coburn Mot. ("Conf. Page-Wilson Oppo. Decl."), ¶ 5 & Exh. A. According to two PMA Board members, McMahon and Miniace arranged for the purchase of this insurance without the knowledge or authorization of the PMA Board or its Compensation Committee. Levy Oppo. Decl., Exh. I at 24, 216; Levy Oppo. Decl., Exh J at 114.

In addition to the long-term care insurance, PMA paid for both Miniace and McMahon to have memberships at two country clubs. McMahon belonged to both the Lake Merced Country Club, for which PMA paid the $48,400 initial membership fee and dues of at least $19,000, and the Olympic

---

[1]There was some confusion regarding the amount of compensation that Miniace received from Maritech, because Miniace took his director's fee in the form of lease payments on a Porsche. PMA no longer appears to argue that Miniace received these payments in addition to the director's fees.

[2]While disability insurance provides replacement income if an employee cannot work due to disability, long-term care insurance provides nursing home care to covered persons without regard to employment or retirement status.

United States District Court

For the Northern District of California

Country Club, for which Maritech paid a $10,500 membership fee.  Conf. Page-Wilson Oppo. Decl., ¶¶ 7-15.  Miniace belonged to both the Lake Merced Country Club, for which PMA paid a $45,000 membership fee, almost $29,000 in dues, and a $20,000 "assessment," and the Silverado Country Club, for which PMA paid almost $22,000 in dues.  Conf. Page-Wilson Oppo. Decl., ¶¶ 19-25 & Exh. A, J, K, L.  It appears that at least some of the membership fees associated with these memberships may have been returned to PMA when the membership was cancelled.  *See* Decl. of Jeannette Coburn in Support of Coburn Mot. ("Coburn Decl."), ¶ 7.  Although PMA's Board members have stated that they were aware that Miniace belonged to a country club, it appears that the Board was never formally informed of their memberships.  *See* Levy Oppo. Decl., Exhs. G at 62, H at 173, J at 95.

Finally, Miniace had a company car that exceeded the company's price limit.  A memorandum dated January 1, 1998, indicated that PMA would only spend up to $29,487 on a company car.  Conf. Page-Wilson Oppo. Decl., Exh. 4.  Notwithstanding this policy, on July 27, 1999, Miniace had PMA purchase a Jaguar worth $60,196.48 for his use.  *Id.* at ¶ 16 & Exh. H.  After Miniace used the Jaguar for two years, it was transferred to McMahon for use as his company car.  *Id.* at ¶ 18.  On April 30, 2002, shortly before McMahon's death, Miniace had the title of the Jaguar transferred to McMahon.  Conf. Page-Wilson Oppo. Decl., ¶ 18 & Exh I.  Following McMahon's funeral, Miniace told Jeannette Coburn, McMahon's widow, that she could keep the car.  Coburn Decl., ¶ 4.

## II.    Miniace's Claim for Severance Pay

At the conclusion of the March 17, 2004 presentation by John C. Cook, the attorney hired by PMA's Board to investigate Miniace's actions, the PMA Board voted unanimously to terminate Miniace's employment.  Foy Decl., Exh. 6 at ¶ 5; Exh. 13 at ¶ 6.  On May 20, 2004, Miniace filed a claim for benefits under the severance plan that PMA had in place.  Conf. Levy Decl., Exh. 2.  Under the terms of the severance plan, the plan's administrator was the PMA Employee Benefits Committee.  Conf. Levy Decl., Exh. 1.  Because many members of that committee had reported to Miniace, the committee received permission from the board to appoint an independent fiduciary to review and decide

United States District Court
For the Northern District of California

Miniace's severance claim.[3] McKenna Decl., ¶ 7; Conf. Levy Decl., Exh. 4; Foy Decl., Exh. 18. Jeff Wohl, a partner at Paul, Hastings, Janofsky & Walker LLP, was selected to serve as the independent fiduciary. Conf. Levy Decl., Exh. 8, at 1.

Under the terms of the severance plan, Miniace was entitled to severance unless his termination was "for cause." Conf. Levy Decl., Exhs. 1, 8 at 2. The plan defined "for cause" as "termination for unsatisfactory performance and/or misconduct, including, but not limited to, termination due to a lack of ability to perform." *Id.*, Exh. 1 The plan further stated that "for cause" would be "determined by PMA in its sole, absolute, and unreviewable discretion." *Id.*, Exhs. 1, 8 at 2.

In his claim for benefits, and again in a reply that he filed, Miniace asserted that his actions were justified because he was vested by the Board with broad discretion over matters of benefits and compensation. Conf. Levy Decl., Exh. 5. Miniace further claimed that PMA's Board knew of his actions from informal consultation, but that there was no record of Board approval of his actions because PMA had a "don't write it down" culture. *Id.* Finally, Miniace argued that his termination had been orchestrated by fellow Board member Jon Hemingway, who had both poisoned the Board against Miniace and hired Cook to conduct a biased investigation. *Id.*

Contemporaneously with his claim for severance benefits, Miniace also filed suit against PMA in San Francisco Superior Court, seeking to recover unpaid bonuses, severance pay, and damages for intentional infliction of emotional distress. PMA removed the action to this Court and promptly filed counterclaims against Miniace. PMA also filed cross-claims against Coburn, Corrigan, and three companies associated with Corrigan: Benmark, Inc., Benmark West, and Corrigan & Company. Through its counterclaims and cross-claims, PMA sought the return of the benefits it believed were wrongfully obtained by Miniace and McMahon, including the $10.1 million death benefit paid to Coburn.

While the case in this Court proceeded, Wohl ruled on Miniace's claim for severance pay. In

[3]PMA decided to proceed with the claim administration procedures outlined in the severance plan despite the apparent facts that no executed copy of the severance plan exists and that the plan was never presented to or approved by PMA's Board. Conf. Levy Decl., Exh. 2. PMA continues to maintain that it has not waived the ability to contest the validity of the severance plan if Miniace is successful in his claim for benefits. Conf. Levy Decl., Exh. 4; PMA Mot. at 8 n. 4.

a 28-page decision dated December 30, 2004, Wohl rejected all of Miniace's arguments. Conf. Levy Decl., Exh. 8. Wohl determined that PMA had a "reasonable, good faith belief, reached after adequate investigation, that Mr. Miniace had engaged in unsatisfactory performance or misconduct." *See id.* at 21-22 (deriving standard from *Cotran v. Rollins Hudig Hall Int'l, Inc.*, 17 Cal. 4th 93 (1998)). Wohl based this determination on a number of grounds:

> Mr. Miniace ended up receiving compensation and benefits far in excess of what was provided for by his employment contract with the PMA, including: a much more lucrative split-dollar benefit; a long-term care plan that was portable and limited to only a few PMA employees, and that differed materially from the disability-plan available to PMA employees generally; significant director's fees from Maritech; car allowances above the agreed-upon levels; and paid membership in a golf club. . . . [G]iven Mr. Miniace's position at the PMA – he was, after all, its highest ranking executive – and his personal role in creating, effecting, or administering the increase in compensation and benefits at issue, his unsatisfactory performance or misconduct may be inferred from his pattern of non-disclosure to the Board and a lack of express Board authorization for these increases in his compensation and benefits compared to his employment contract, as well as the compensation and benefits he directed to other senior executives.

*Id.* at 22-23.

Wohl also explicitly addressed Miniace's argument that the Board was generally aware of and approved of his actions: "But as President of the PMA, Mr. Miniace was held to rigorous standards of fiduciary duty and accountability to the PMA . . . . [His] admitted repeated failures to make a full and fair disclosure of those arrangements to the Board or its authorized committees . . . can reasonably be viewed as a breach of his fiduciary duty to the PMA." *Id.* at 25. Wohl also addressed Miniace's argument that Hemingway orchestrated his termination. Wohl rejected this argument because "the record shows Mr. Miniace engaged in the acts and omissions on which I am basing my determination; PMA senior staff, not Mr. Hemingway, identified and retained Mr. Cook . . . ; and the Board's vote to terminate Mr. Miniace's employment was unanimous." *Id.* at 26. Finally, Wohl acknowledged and denied Miniace's request for discovery, because "it does not appear that discovery would change the fundamental facts that Mr. Miniace has admitted or failed to dispute." *Id.* at 27.

Following the rejection of his claim, Miniace submitted a request for review of Wohl's decision, in accordance with PMA's severance plan. Conf. Levy Decl., Exh. 9. After the parties has submitted their briefs, Miniace supplemented his briefs with emails containing developments he learned through discovery obtained in his parallel lawsuit. *Id.*, Exhs. 13, 14, 17 at 1. Wohl considered Miniace's new

United States District Court
For the Northern District of California

submissions, but once again rejected Miniace's claim for severance benefits, this time in a 30-page decision. *Id.*, Exh. 17.

**III. Current Motions**

PMA and Maritech, Miniace, and Coburn have now all brought motions for partial summary judgment. PMA seeks summary judgment against Miniace's claims for severance pay and for intentional infliction of emotional distress. Miniace seeks summary judgment on claims brought by PMA and Maritech that relate to Miniace's receipt of Maritech director's fees. Coburn seeks summary judgment against Maritech's claims that relate to Maritech director's fees paid to McMahon, and against PMA's claims concerning unauthorized benefits that McMahon received and the $10.1 million she received from McMahon's SEBP policy.[4]

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the Court that there is an absence of evidence to

---

[4]In addition to the many briefs submitted on the three motions at issue, PMA has submitted three additional briefs purporting to raise evidentiary objections. The first objects to the new evidence Miniace has submitted to this Court that he did not submit to Wohl. The other two briefs contest factual representations made in the briefs filed by Miniace and Coburn. Miniace and Coburn have moved to strike these filings.

The Court agrees with Miniace and Coburn that, to the extent these briefs raise arguments not related to admissibility of evidence, they are improper. Accordingly, the Court has disregarded the content of PMA's filings to the extent they do not raise legitimate evidentiary objections. Because PMA has raised some proper evidentiary objections, however, the Court DENIES Coburn's and Miniace's blanket request to strike the briefs (Docket Nos. 215, 231).

For the reasons discussed in footnote 9, *infra*, however, the Court agrees with PMA that Miniace may not introduce evidence that was not considered by Wohl in support of his claim for severance. Accordingly, the Court DENIES Miniace's motion to strike (Docket No. 230) and SUSTAINS PMA's objections to the new evidence Miniace has produced (Docket No. 220).

United States District Court
For the Northern District of California

support the non- moving party's case. *See id.* at 325.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [ non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id.*

## DISCUSSION

PMA, Miniace, and Coburn, all bring summary judgment motions seeking dismissal of various claims against them. The Court considers each in turn.

## I. PMA's Motion

PMA moves for summary judgment on two causes of action brought by Miniace: Miniace's claim that he is entitled to severance pay, and his claim for intentional infliction of emotional distress.[5] The Court GRANTS PMA's motion in its entirety.

### A. Breach of Contract/Duty under ERISA – Severance (Third Cause of Action)

[5]All references to Miniace's complaint are to the first amended complaint, which Miniace provided to the Court on November 22, and which is being filed concurrently with this order. The parties agree that the first amended complaint does not affect any substantive issues in the summary judgment motions addressed in this order.

Miniace's third cause of action seeks severance benefits in accordance with PMA's severance plan, which entitles PMA's President to 18 months' severance pay if he is terminated without cause. The parties agree that the severance plan was established under the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* Conf. Levy Decl., Exh. 1, at 1 ("PMA has established this Severance Pay Plan ("Plan") under [ERISA]."). Further, the parties agree that, because the plan grants discretionary authority to the plan administrator, this Court reviews Wohl's decision for abuse of discretion.[6] *See id.* at 5 ("[T]he Administrator shall have the power, in its discretion, to interpret and make all determinations as to rights to benefits under the Plan. Its interpretations and determinations thereof shall be final and conclusive and subject to review only to the extent a court concludes that any such interpretation or determination is arbitrary and capricious."); *Bergt v. Retirement Plan for Pilots Employed by Markair, Inc.*, 293 F.3d 1139, 1142 (9th Cir. 2002) ("[W]hen an ERISA plan grants discretionary authority to the plan administrator to determine plan eligibility, the court will ordinarily review a . . . decision to deny benefits for an abuse of discretion.").

Courts have identified many ways in which a plan administrator can abuse its discretion. As summarized recently by another court:

> "ERISA plan administrators abuse their discretion if they render decisions without any explanation, or construe provisions of the plan in a way that conflicts with the plain language of the plan." *Taft*, 9 F.3d at 1472 (internal quotation marks omitted); *see also Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005) (same). An administrator also abuses its discretion "if it relies on clearly erroneous findings of fact in making benefit determinations," *Taft*, 9 F.3d at 1473, "fails to develop facts necessary to make its determination," *Schikore v. BankAmerica Supplemental Retirement Plan*, 269 F.3d 956, 960 (9th Cir. 2001), or "arbitrarily refuse[s] to credit a claimant's reliable evidence," *Jordan*, 370 F.3d at 879 (internal quotation marks omitted). In addition, "an error of law constitutes an abuse of discretion." *Schikore*, 269 F.3d at 960. However, "a decision grounded on any reasonable basis" is not an abuse of discretion. *Jordan*, 370 F.3d at 875 (italics in original) (internal quotation marks omitted).

*Lundquist v. Continental Casualty Co.*, 394 F. Supp. 2d 1230, 1245 (C.D. Cal. 2005).

Miniace provides two reasons why Wohl abused his discretion. His primary argument is that Wohl "failed to develop facts necessary to make his determination." *See Schikore v. BankAmerica*

---

[6] Although the plan purports to establish an "arbitrary and capricious" standard, such a standard is equivalent to an abuse of discretion standard. *See Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1321 n.1 (9th Cir. 1995) ("The standards differ in name only.").

United States District Court
For the Northern District of California

*Supplemental Retirement Plan*, 269 F.3d 956, 960 (9th Cir. 2001). Miniace bases this claim on Wohl's refusal to force PMA to produce documents during the review process, and on his refusal to delay his decision until Miniace had pursued discovery in this litigation. The Court does not agree that Wohl's conduct was inadequate.

As an initial matter, although Wohl refused to delay his decision to allow Miniace to conduct discovery, the facts show that Miniace was able to conduct a substantial amount of discovery before his claim was denied. Miniace filed his ERISA claim on May 20, 2004. He filed his state court lawsuit in July 2004. His original ERISA claim was not denied until December 30, 2004, a full five months later. More importantly, his last submission in support of his request for review was made on June 17, 2005. Conf. Levy Decl., Exh. 14. At that point, Miniace had already received substantial discovery in this litigation: PMA had provided its initial disclosures, it had responded to Miniace's first set of interrogatories, and it had responded to his first set of document requests.[7] Decl. of Glenn M. Levy in Support of PMA Reply ("Levy Reply Decl."), at ¶¶ 5-6. Further, Miniace had taken three depositions during this time. *Id.* To hold that the Fiduciary failed to develop the facts in this matter would require that ERISA benefit determinations include full-blown discovery equivalent to that of litigation, something the Ninth Circuit has warned against. *See Taft*, 9 F.3d at 1473.

Relatedly, Miniace argues that Wohl abused his discretion by failing to delay his opinion for three months while Miniace finished discovery. The Court cannot agree. Miniace's request for further discovery did not alert Wohl to any specific documents that he did not have or information that he was seeking, but only asked for additional time. Levy Decl., Exh. 10 17 at 8-9. While Miniace may have wanted further discovery to press his conspiracy theory that he was driven from his position by Hemingway, Wohl found that theory irrelevant. Instead, as discussed below, Wohl believed that

[7]Although PMA claims it produced 20,500 pages of documents before Miniace's final submission to the Fiduciary, it is unclear how timely those submissions were. *See* Levy Reply Decl., at 3-5 (stating that PMA had produced 19,000 pages of documents by May 6, 2005, and 20,500 by June 17, 2005, but not providing any further specifics).

Miniace's own admissions were sufficient to resolve the case.[8]

Miniace specifically argues that Wohl's failure to develop the record led Wohl to misunderstand the authority the Board had vested in Miniace to set compensation and benefits, as well as the bad faith of the PMA Board in terminating Miniace. This Court, however, believes that Wohl's conduct was entirely adequate. As to Miniace's authority, the fundamental problem with Miniace's argument is that it ignores Wohl's determination that PMA had cause to fire Miniace based on the very facts Miniace set forth in his own submissions. Levy Decl., Exh. 17 at 8-9. Indeed, Miniace admitted to the precise conduct that Wohl determined gave PMA cause to fire him: awarding himself significant increases in compensation and benefits without obtaining express Board approval or even disclosing his actions to the Board. Levy Decl., Exh. 8 at 23. Although Miniace continues to argue that he had discretion to set compensation and benefits, Wohl took issue not with his discretion, but with his failure to inform the Board of Directors of the significant decisions he made, decisions that he had a very large personal stake in.

The Court also cannot agree with Miniace's argument that Wohl erroneously determined that PMA acted in bad faith. Wohl explicitly addressed Miniace's contention that there was a "plot to kill the king" orchestrated by Hemingway and rejected it for the reasons stated above. Miniace has provided nothing to the Court that undermines Wohl's findings. Given that Miniace's actions, as well as his failure to disclose his actions to the PMA Board, are undisputed, the Court believes that the investigation PMA conducted was reasonable under the circumstances. Thus, the Court cannot find that Wohl abused his discretion.

Finally, the Court has reviewed Miniace's additional evidence, and continues to agree that Wohl's conclusions were reasonable.[9] The major problem that Miniace faces is that, even if his

---

[8]PMA has also alleged that Miniace was not entirely diligent about pursuing discovery. While Miniace could have noticed depositions starting on December 13, 2004, he waited until January 15, 2005, to notice his first deposition. Over the next five months, Miniace took only four days of depositions, and did not notice the depositions of some of the most integral members of his conspiracy theory until the end of July 2005.

[9]The Court agrees with PMA that it may not consider evidence that was not submitted to Wohl. The only case that Miniace cites which supports his position is directly contrary to Ninth Circuit law. *Compare Teeter v. Supplemental Pension Plan of Consolidated Railway Corp.*, 705 F. Supp. 1089, 1096

United States District Court
For the Northern District of California

allegations are true -- if he possessed substantial discretion to determine compensation and benefits, if he worked tirelessly for PMA, and if his benefit actions were reasonable -- it remains true that he took actions that provided a tremendous benefit for himself and his friends without informing the Board of Directors of his decision. There is no question that Miniace made compensation decisions that had a profound impact both on PMA's officers and its finances. There is also no dispute that Miniace never informed the Board of many of these decisions. Without evidence that Miniace's actions were specifically authorized by the Board, Wohl was well within his discretion to conclude that Miniace's actions constituted a breach of fiduciary duty.

Miniace's second basis for his assertion that the Fiduciary abused his discretion is that the Fiduciary "refused to credit Miniace's evidence." On this point, however, PMA is correct: the Fiduciary did not refuse to credit Miniace's evidence; to the contrary, Wohl simply believed that Miniace's evidence was not relevant to his final analysis. As discussed above, this position is reasonable.

Based on the foregoing, the Court GRANTS PMA's motion for summary judgment on Miniace's claim for severance benefits.

**B. Intentional Infliction of Emotional Distress (Seventh Cause of Action)**

Miniace's seventh cause of action seeks damages for intentional infliction of emotional distress that Miniace claims occurred when he was terminated. PMA moves for summary judgment on this cause of action, claiming that California workers' compensation law preempts Miniace's claim.

Section 3600 of the California Labor Code establishes an employee's right to workers' compensation, providing that "[l]iability for the compensation provided by this division, in lieu of any other liability whatsoever to any person . . . shall . . . exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment." Cal. Labor Code §

---

(E.D. Pa. 1989) (finding that plan administrator's failure to consider three affidavits that were not before it until after the final appeal constituted a due process violation), *with Banuelos v. Construction Laborers' Trust Fund for S. Calif.*, 382 F.3d 897, 904 (9th Cir. 2004), *cert. denied*, -- U.S. --, 125 S. Ct. 2936 (2005)("We have clearly established that the abuse of discretion standard permits the district court to 'review only the evidence presented to the [plan] trustees.'") (citing *Taft*, 9 F.3d at 1471). The rest of the cases Miniace cites do not support his argument that this Court may consider evidence not before the Fiduciary. *See, e.g.*, *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1091-95 (9th Cir. 1999) (*en banc*) (court could review additional evidence because standard of review was *de novo*).

United States District Court
For the Northern District of California

3600(a). Further, California Labor Code § 3602 provides that, where § 3600 applies, "the right to recover such compensation is . . . the sole and exclusive remedy of the employee." Cal. Labor Code § 3602(a). The California Supreme Court has held that these provisions apply to all injuries that result from an employment relationship, including injuries for intentional infliction of emotional distress. *See Livitsanos v. Superior Court*, 2 Cal. 4th 744, 747 (1992) (workers compensation system preempted action for intentional infliction of emotional distress, regardless of whether or not that distress caused a disability).

Miniace urges two reasons why his emotional distress claim is not preempted by the workers' compensation system. First, Miniace argues that California workers' compensation law does not apply because PMA's actions occurred after his employment relationship with PMA had been terminated. California courts have held, however, that focusing on the duration of the employment relationship is not the correct inquiry. Rather, the correct inquiry is whether the challenged action relates to the employment relationship. Thus, in *Gates v. Trans Video Corp.*, 93 Cal. App. 3d 196 (Cal. App. 1979), the Court stated:

> In regard to the incident of September 27, although respondent had undoubtedly been fired by that date, we deem it unimportant to decide whether his actual date of termination was September 11th as he claims, or the 24th, as is contended by appellants, although the evidence points to the latter. In either event, his return to the employer's premises to return keys, tools and uniforms at the employer's request was "directly connected with the employment relationship and, being incident thereto, the employee [is] entitled to the protection of workers' compensation until he had left the premises."

*Id.* at 203-04 (quoting *Mitchell v. Hizer*, 73 Cal. App. 3d 499, 505 (Cal. App. 1977)) (footnote omitted); *see also Horn v. Bradco Int'l, Ltd.*, 232 Cal. App. 3d 653, 663-65 (Cal. App. 1991) ("[T]he temporal sequence of events is not the conclusive test of whether the injury arose out of the employment relationship."); *Spratley v. Winchell Donut House, Inc.*, 188 Cal. App. 3d 1408, 1412 (Cal. App. 1987) (allegations of fraudulent inducement of employment fell within workers compensation scheme, even though allegedly fraudulent acts occurred before employment relationship).

There is no doubt that the factual allegations Miniace makes in support of his emotional distress claim are related to his employment relationship with PMA. The actions PMA took that form the basis for Miniace's emotional distress claim are intricately related to his termination. *See* First Amended Complaint, ¶¶ 46-47. For example, Miniace alleges that he suffered emotional distress because: "PMA

United States District Court
For the Northern District of California

refuse[d] to acknowledge the validity of corporate documents which clearly show Miniace's authority to act and entitlement to various benefits." Orrick Oppo. Decl., Exh. A at 4. Miniace also claims that his distress occurred because "[PMA's] Board of Directors, knowing that Miniace had no other source of support, refused to provide him with any severance whatsoever [and] contested his right to unemployment compensation benefits." *Id.* Indeed, all of PMA's actions that Miniace claims caused him emotional distress arose in the context of the dispute over Miniace's severance pay. The Court finds that these actions are closely related to Miniace's employment with PMA, and are therefore covered by California's workers' compensation scheme.

Miniace's second argument against preemption is that PMA's conduct was so egregious that it falls outside of the "normal risk of an employment relationship." Miniace Oppo. Br. at 30. In *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal. 3d 148 (1987), the California Supreme Court acknowledged that an employer's intentional efforts to cause emotional distress to an employee could give rise to an action outside of the workers' compensation system. *Id.* at 159-160; *see also Livitsanos v. Superior Court*, 2 Cal. 4th 744, 756-57 (1992) (remanding to Court of Appeal to determine if the employer's conduct was "outside the scope and normal risks of employment"). The Court was careful, however, to strictly limit the basis for any such action to only the most compelling of circumstances:

> [W]hen the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance resulting in disability.

*Cole*, 43 Cal. 3d at 160.

In this case, Miniace's allegations simply do not meet this standard. Among other things, Miniace alleges that PMA "refused to acknowledge the validity of corporate documents," "accused him of stealing from it and concealing benefits for which he had been given explicit authority," and "concealed the truth from Cook" resulting in a "biased investigation." Orrick Oppo. Decl, Exh. A, at 4-5. Once again, PMA's alleged actions are intricately intertwined with legitimate work practices, such as "criticism of work practices, and frictions in negotiations." Accordingly, PMA's actions cannot be considered "outside the scope and normal risks of employment." *Compare Livitsanos*, 2 Cal. 4th at 756

(remanding case where employer harassed plaintiff for almost a year, deliberately lied about plaintiff on numerous occasions to plaintiff's coworkers, and forced plaintiff to sign $100,000 loan).

**C. Conclusion**

Based on the foregoing, the Court GRANTS PMA's motion for partial summary judgment in its entirety.

**II. Miniace's Motion**

Miniace's summary judgment motion challenges the twenty-fourth, twenty-fifth, and twenty-sixth counterclaims, all of which relate to the director's fees Miniace received from Maritech. Miniace argues that the claims brought by Maritech (the twenty-fourth and twenty-fifth causes of action) must fail because the Maritech Board of Directors approved the benefits. He also argues that the claim by PMA (the twenty-sixth cause of action) fails because PMA cannot prove he was unjustly enriched.

**A. Claims by Maritech**

Maritech brings causes of action for breach of fiduciary duty and conversion against Miniace, seeking recovery of the director's fees that Miniace received. Miniace argues that Maritech's claims must fail because the undisputed evidence shows that Maritech's Board of Directors approved the director's fee.

**1. Breach of Fiduciary Duty**

Maritech is a Nevada corporation. Under Nevada law, "the board of directors, without regard to personal interest, may establish the compensation of directors for services in any capacity. . . . [S]uch compensation is presumed to be fair to the corporation unless proven unfair by a preponderance of the evidence." Nev. Rev. Stat. § 78.140(4). In addition, Maritech's bylaws provide that its directors "may be paid a fixed sum for attendance at each meeting of the Board of Directors." Conf. Harriman Decl., Exh. 115 at § 3.13. The Maritech Board authorized the director's fees pursuant to these provisions. *Id.*, Exhs. N, O, P.

United States District Court
For the Northern District of California

The Court agrees with Miniace that Maritech may not base its claim for breach of fiduciary duty on the mere fact that the director's fee was instituted. Section 78.140(4) states in no uncertain terms that a board of directors may establish compensation for directors "without regard to personal interest." Nev. Rev. Stat. § 78.140(4). Based on this provision, the Court finds that the mere fact that Miniace voted in favor of a director's fee cannot support a claim that he breached his duty of loyalty.

The Court disagrees with Miniace, however, that there is no genuine issue of material fact concerning whether the fee was excessive. There is evidence in the record that the director's fee was inappropriate for a company of Maritech's size. Decl. of Jonathan W.B. Cosby in Oppo. to Miniace Mot., ¶ 4 ("[B]ased on my experience . . . the amount of the fees was excessive for a company of Maritech's size and operations."). In fact, according to Miniace himself, the director's fee was ten times greater than it should have been for a company of comparable size to Maritech. Decl. of Michael J. Baker in Oppo. to Miniace Mot., ¶ 3 (after consulting with PriceWaterhouseCoopers, Miniace learned that the director's fee "should be more in the amount of . . . $2500 a Board meeting"). This is sufficient to raise a question of material fact as to whether Miniace breached his fiduciary duty to Maritech. *See* Nev. Rev. Stat. § 78.140(4); *cf. Schoff v. Clough*, 79 Nev. 193, 196 (1963) (examining transaction with corporate officer to determine if price was reasonable); *In re Western World Funding, Inc.*, 52 B.R. 743, 763 (Bk. D. Nev. 1985) (fiduciaries who engage in transactions with corporation may not benefit at the expense of the corporation, and must ensure that interested transactions are inherently fair).

**2. Conversion**

As to Maritech's claim based on conversion, the Court agrees with Miniace that the claim must be dismissed. "The elements of conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages." *Farmers Ins. Exchange v. Zerin*, 53 Cal. App. 4th 445, 451 (Cal. App. 1997). Here, Maritech alleges that the wrongful act was the creation of a director's fee when "Miniace had been told that PMA officers should receive no economic benefit from Maritech." PMA Oppo. Br. at 15.

Although money can be the subject of an action for conversion, *see Farmers*, 53 Cal. App. 4th

at 452, Maritech has not provided any authority for its assertion that conversion applies in these circumstances. Indeed, the Court has been unable to find a single case involving an action for conversion under a similar set of facts. Given that the director's fee was technically authorized by the Maritech Board, the Court does not believe that the tort of conversion is appropriate. *Cf. Cerra v. Blackstone*, 172 Cal. App. 3d 604, 609 (Cal. App. 1985) (sale of property constitutes conversion only where it was unauthorized). Accordingly, the Court GRANTS Miniace's motion with respect to the twenty-fifth counterclaim.

**B. Claim by PMA**

PMA also brings a claim for unjust enrichment against Miniace, claiming that he abused his position of trust with PMA when he "wrongfully and fraudulently received duplicate and excessive compensation in violation of the terms of his employment agreement with PMA." PMA bases this claim on Miniace's failure to disclose the Maritech director's fees to the PMA Board when reporting to them about his executive compensation. Miniace argues that this claim should be dismissed because the fees were reasonable compensation for the work he performed for Maritech.

While close, the Court finds that there is a genuine issue of material fact on this claim, for two reasons. First, Miniace owed a duty of candor to the PMA board. *See Western Indus., Inc. v. General Ins. Co.*, 91 Nev. 222, 228 (1975) ("[A] corporate officer and director . . . owes a duty of good faith, honesty, and full disclosure."). Under this duty of candor, he had the obligation to inform PMA of the benefit he received for duties that he performed within the scope of his employment. It is undisputed that Miniace was directed to sit on the Maritech Board by his superiors at PMA. By failing to inform those superiors of the Maritech director's fee, Miniace effectively increased his salary without disclosing that he was doing so. Especially given that there is evidence in the record that McMahon was told not to use Maritech for personal gain, Miniace's actions may have violated his fiduciary duties, and thus unjustly enriched him. *See* Hemingway Oppo. Decl., ¶ 4.

Second, Miniace's fiduciary duty also prevented him from engaging in self-dealing transactions at the expense of PMA. *See Tevis v. Beigel*, 156 Cal. App. 2d 8, 15-16 (Cal. App. 1957) (fiduciary's dealings with corporation must ultimately be for benefit of corporation). Yet by awarding himself a

director's fee from PMA's subsidiary, he may have received "a benefit and unjust[ly] [retained] it at the expense of [PMA]." *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (Cal. App. 2000).

Thus, the Court finds that PMA's claim for unjust enrichment survives summary judgment.

**C. Conclusion**

As described above, the Court GRANTS Miniace's motion as to Maritech's claim for conversion, and DENIES the motion as to Maritech's claim for breach of fiduciary duty and PMA's claim for unjust enrichment.

**III. Coburn's Motion**

Coburn, like Miniace, challenges the cross-claims against her that are related to Maritech director's fees – the twenty-seventh, twenty-eighth, and twenty-ninth counterclaims. Coburn also challenges PMA's ninth, tenth, and eleventh counterclaims, which seek reimbursement for unauthorized employee benefits, and PMA's twenty-third counterclaim, which seeks recovery of the approximately $10 million in death benefits paid to Coburn under McMahon's SEBP policy.

**A. Maritech Director's Fees**

The twenty-seventh, twenty-eighth, and twenty-ninth counterclaims are all brought by Maritech and concern the director's fees that it paid to McMahon. The twenty-seventh cause of action is for declaratory relief, while the twenty-eighth cause of action is for unjust enrichment and the twenty-ninth cause of action is for common count.

As to the unjust enrichment cause of action, the Court finds that there remains a material issue of fact. "An individual is required to make restitution if he or she is unjustly enriched at the expense of another." *First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1662 (Cal. App. 1992). There is no dispute that Coburn received the benefit of the Maritech director's fees. Further, for the reasons described above, an issue of fact remains regarding whether McMahon breached his fiduciary duty to

**United States District Court**
For the Northern District of California

Maritech.[10] Given that Coburn may have wrongfully acquired the director's fees, the only question is whether, as between Maritech and Coburn, it would be unjust for Coburn to retain them. *Id.* at 1663.

Generally, when an innocent transferee is involved, restitution is denied "if he has changed his position after the transaction and it is impossible or impractical to restore him to his original position." *Id.* Although there is no evidence that Coburn knew that the director's fees resulted from a breach of her husband's fiduciary duty, there is also no evidence that Coburn has relied on the funds to her detriment. Accordingly, the Court finds that there remains a material issue of fact over whether Coburn was unjustly enriched by the Maritech director's fees. *See Ghirordo v. Antonidi*, 14 Cal. 4th 39, 51 (1996) (innocent individuals who receive benefits can be unjustly enriched provided they have not detrimentally relied on the benefits).

The Court, however, finds that the cause of action for common count must be dismissed. Common count is used for obtaining recovery from a debt stemming from a contract. "The only essential allegations of a common count are '(1) the statement of indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment.'" *Farmers*, 53 Cal. App. 4th 445 (1997). Here, Maritech's claim does not allege the existence of any contract, nor has it identified what consideration it provided. Accordingly, the Court finds that common count is not applicable to the current situation. *Cf. Utility Audit Co. v. City of Los Angeles*, 112 Cal. App. 4th 950, 958 (Cal. App. 2003) ("Whether an action is based on contract or tort depends upon the nature of the right sued upon, not the form of the pleading or relief demanded. If based on breach of promise it is contractual; if based on breach of a noncontractual duty it is tortious.").

**B. SEBP Benefits**

Coburn moves for summary judgment on PMA's counterclaim for the approximately $10 million she received in death benefits from McMahon's SEBP policy. Coburn argues that McMahon was not a fiduciary of the SEBP when he signed the amendment, and that he therefore may not be sued for

---

[10]Indeed, the possibility that McMahon breached his fiduciary duty is augmented by evidence that he incorrectly told other Maritech Board members that both PMA and PriceWaterhouse had been informed of, and approved, the director's fee. Epperson Oppo. Decl., ¶ 11.

breach of fiduciary duty.

It is undisputed that McMahon, as CFO, was administrator of the SEBP and was therefore the plan's fiduciary. Foy Decl., Exh. 9 at ED 1470; 29 U.S.C. § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."). Coburn argues, however, that although McMahon acted as a beneficiary of the SEBP when the amendment was made, he was not a fiduciary at the time he signed the SEBP amendment, because Miniace signed it on behalf of the company. *See* Harriman Decl., Exh. 41; *see also Acosta v. Pacific Enterprises*, 950 F.2d 611, 618 (9th Cir. 1991) ("[29 U.S.C. § 1002(21)(A)] makes clear that a person's actions, not the official designation of his role, determine whether he enjoys fiduciary status.").

There is some support for Coburn's position in the record. The parties who were involved in McMahon's SEBP amendment testified that they independently wanted the amendment to occur. *See* Harriman Decl., Exh. A at 131 (testimony of Michael Corrigan about a meeting with Miniace, Epperson, and Wechsler where they discussed amendment); Exh. B (testimony of Miniace that he felt like he "had the responsibility and the obligation to" amend the SEBP). Further, McMahon was not even present when the amendment was signed on behalf of PMA; he was in Houston for medical reasons. Coburn Decl., ¶ 13.

There are a number of problems with Coburn's position, however. Most importantly, it reads PMA's counterclaim too narrowly. PMA's counterclaim focuses not only on the execution of the amendment, but also on the decision to proceed with the amendment. *See Weisler v. Metal Polishers Union & Metal Prod. & Novelty Workers Union*, 533 F. Supp. 209, 216 (S.D.N.Y. 1982) (a person who is both a fiduciary and a interested party "is held to a strict standard of undivided loyalty. Not only must he not become directly involved in a transaction or decision from which he might personally benefit, but he must not allow 'himself to be placed in a position where his personal interest might conflict with the interest of the (Funds).'"). In this respect there remains a genuine issue of material fact. McMahon discussed the amendment with Miniace and Corrigan before it was executed. These discussions, however, were generally non-specific; the three decided to wait until the final IRS regulation was issued

to make a final decision. Levy Decl., Exh. A at 122-125. When McMahon was diagnosed with cancer, however, the conversations became specific. Indeed, Corrigan testified at deposition that he met with McMahon very soon after he was diagnosed with cancer to discuss the mechanics of amending McMahon's SEBP so that Coburn would receive the full $10 million in benefits. Levy Decl., Exh. A, at 126-27, 130-31.

Thus, there is factual support in the record for PMA's contention that McMahon participated in the decision to "flip" his SEBP benefits. In participating in that decision, McMahon may have failed to live up to his fiduciary duty to PMA. PMA may therefore bring suit against Coburn, McMahon's successor in interest, for any breach of his fiduciary duty. *See Hardy v. Kaszycki & Sons Contractors, Inc.*, 842 F. Supp. 713, 717-18 (S.D.N.Y. 1993).

**C. Other Benefits**

Finally, Coburn challenges PMA's counterclaims that relate to other employment benefits, including company cars, company-sponsored country club memberships, and company-funded long-term health insurance.

As to the country club membership, Coburn argues that she cancelled the membership and donated the funds to scholarships in her husband's name when told by Miniace that she could keep the funds. Coburn Decl. ¶ 8. PMA does not dispute this fact. Accordingly, the Court finds that Coburn has detrimentally changed position and GRANTS Coburn's motion for summary judgment with respect to the country club membership *See Ghirordo*, 14 Cal. 4th at 51-53.

As to the long-term care insurance, Coburn argues that she cancelled the policy and had the premiums returned to PMA. Coburn Decl, Exh. F. Although PMA argues that it has not yet received any payment from the insurance company, it does not contest that Coburn cancelled the policy. Accordingly, the Court finds that Coburn has not been unjustly enriched and GRANTS Coburn's motion with respect to the long-term care insurance. *See Katsivalis v. Serrano Reconveyance Co.*, 70 Cal. App. 3d 200, 210 (Cal. App. 1977) (unjust enrichment is measured by benefit conferred, not amount of injury).

Finally, as to the Jaguar, PMA has not shown how Coburn was unjustly enriched. The facts

show that the car was not transferred to Coburn until after McMahon's death. Coburn Decl. at ¶ 4-5. Given the fact that Coburn had no fiduciary duty to PMA, it is unclear how the gift of the car was unjust. *See Ghirordo v. Antonidi*, 14 Cal. 4th 39, 51 (1996) ("Even when a person has received a benefit from another, he is required to make restitution 'only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.'"). Especially given that Miniace gifted Coburn the car, and that PMA's Controller transferred the title, the Court finds as a matter of law that it is not "unjust" for Coburn to retain it.

**D. Conclusion**

Based on the above, the Court GRANTS Coburn's motion as to the twenty-ninth counterclaim for common count, and as to the ninth, tenth, and eleventh counterclaims based on McMahon's receipt of company cars, country club memberships, and long-term care insurance. The Court DENIES Coburn's motion with respect to the twenty-third counterclaim for the SEBP death benefits.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS PMA's motion for partial summary judgment in its entirety (Docket No. 151); GRANTS Miniace's motion for partial summary judgment with respect to Maritech's twenty-fifth counterclaim, and DENIES the remainder (Docket No. 140); and GRANTS Coburn's motion for partial summary judgment with respect to PMA's ninth, tenth, eleventh, and twenty-ninth counterclaims, and DENIES the remainder (Docket No. 147).

**IT IS SO ORDERED.**

Dated: February 22, 2006

SUSAN ILLSTON
United States District Judge