**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOSEPH N. MINIACE, an individual,

              Plaintiff,

  v.

PACIFIC MARITIME ASSOCIATION, a
California non-profit corporation,

              Defendant.
_____/

PACIFIC MARITIME ASSOCIATION, a
California non-profit corporation, and
MARITECH CORPORATION, a Nevada
corporation,

              Counterclaimant and Cross-
claimants,

  v.

JOSEPH N. MINIACE, an individual;
JEANETTE M. COBURN, an individual;
MICHAEL E. CORRIGAN, an individual;
BENMARK, INC., a Georgia corporation;
CORRIGAN & COMPANY; BENMARK
WEST,

              Counterdefendant and Cross-
defendants.
_____/

No. C 04-3506 SI

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

**SUMMARY**

      Plaintiff Joseph Miniace originally filed this action in state court, alleging that defendant Pacific

Maritime Association ("PMA") breached its employment contract with Miniace by failing to make

various payments to Miniace upon his termination.  PMA removed the case to this Court in August of

United States District Court

For the Northern District of California

2004.  Plaintiff's first amended complaint alleged seven causes of action, four of which remain to be resolved.  PMA and Maritech Corporation alleged twenty-nine counterclaims for relief against various combinations of Miniace, Jeanette Coburn, Michael Corrigan, and several companies associated with Corrigan.  Four of the counterclaims are claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 *et seq*.  On the eve of the bench trial, defendants filed a motion to amend to allege two additional claims for relief under ERISA.

The parties agreed to bifurcate the Court-tried ERISA claims from the jury claims, and to conduct the ERISA trial first.  *See* Final Pretrial Scheduling Order at 1.  To avoid unnecessary duplication, all parties except the Corrigan parties agreed to waive a jury trial on any issues decided by the Court in the ERISA trial which must also be decided in the jury trial.  *Id*. at 2.  From May 22, 2006 through June 6, 2006, the Court held a bench trial on the defendants' ERISA claims.

As set forth below, the Court finds that Miniace and Thomas McMahon breached their fiduciary duties to PMA by creating, funding and amending the Secured Employee Benefit Plan ("SEBP") without fully disclosing the details surrounding the SEBP to PMA's Board of Directors.  The Court rejects Miniace's attempt to characterize the SEBP as a "benefit" that did not need to be disclosed to the Board.  The SEBP was intended to provide significant retirement income to its participants, and required a considerable financial outlay on the part of PMA, both initially and on an annual basis.  Whether the SEBP is viewed as an element of compensation, or as a significant benefit, Miniace and McMahon should have fully informed the Board regarding the details of the Plan prior to its establishment.  The SEBP benefitted a small number of executives, and benefitted Miniace and McMahon the most out of that small group.  By creating the SEBP, Miniace and McMahon engaged in a self-interested transaction that uniquely benefitted themselves, and as such they were required to fully and accurately disclose the transaction to the Board or its designated committee, which they did not do.

The Court also finds that Miniace and McMahon amended the SEBP in April 2002 to ensure that McMahon's beneficiaries, not PMA, would receive McMahon's death benefit under the SEBP.  The interim IRS guidelines issued in 2000 and 2001 did not require the 2002 Amendment.  Instead, the

///

1   Amendment was precipitated by McMahon's diagnosis of terminal cancer.

2          While these actions constituted breaches of their corporate fiduciary duties to PMA, the Court

3   finds that ERISA does not neatly apply to the facts of this case.  The Court finds that while Miniace and

4   McMahon were ERISA fiduciaries, they did not breach any duties under ERISA in creating the Plan or

5   causing PMA to fund the Plan.  Rather, both actions are properly viewed under ERISA as settlor

6   functions rather than fiduciary activities.  *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 77

7   (1995).  The facts do not comfortably fall under an ERISA construct because PMA is not a participant

8   in the SEBP, and does not appear to a be "beneficiary" as that term is used in the Plan.  However, PMA

9   is a named fiduciary of the Plan, and the terms of the SEBP provided, prior to the 2002 Amendment,

10  that PMA would receive benefits under the Plan.  Accordingly, the Court finds that Miniace and

11  McMahon owed PMA a fiduciary duty under ERISA, and that they breached that duty when they

12  amended the Plan in 2002 and altered PMA's entitlement without full disclosure and approval by the

13  Association.

14         The Court further finds, however, that while Miniace and McMahon never fully disclosed the

15  details of the SEBP to the Board, the Board was provided some notice of the creation and continued

16  existence of the SEBP.  For example, the Board, through Executive Committee member C. Bradley

17  Mulholland, received written information about the creation of the SEBP in August 1996; the evidence

18  at trial showed that Mulholland did not read any of the materials, nor did he ask for further information

19  from Miniace or McMahon prior to signing the November 14, 1996 Resolution approving the creation

20  of the SEBP.  After 1996, the Board had actual or constructive notice of the SEBP through, *inter alia*,

21  an April 1997 memorandum prepared by McMahon referring to the "Supplemental Benefit Plan," and

22  Phil Resch's 1999 Departure Agreement which explicitly stated that PMA would contribute over

23  $100,000 to Resch's SEBP upon his departure.  Both in 1996 and afterwards, the Board should have

24  requested information from Miniace and McMahon regarding the SEBP.  The Board failed to do so, and

25  never took any action with regard to the SEBP until 2003, and then only in response to final IRS

26  guidelines regarding split-dollar plans such as the SEBP.

27         The Court further finds that the 2002 Amendment was not inconsistent with the original intent

28  of the SEBP.  The primary purpose of the SEBP was to reward certain of PMA's senior executives by

providing tax-free retirement income. Although a stated secondary purpose of the SEBP was to provide PMA with key person insurance, in fact it was intended and expected that upon a participant's retirement, the participant would benefit from the SEBP by receiving significant retirement income, and PMA's interest in the SEBP would substantially diminish. It was never intended that the SEBP would actually provide key person insurance for PMA, or that PMA would benefit financially from the SEBP beyond reimbursement of its expenditures on the plan.

PMA now seeks to rescind or otherwise invalidate the 2002 Amendment to the SEBP, but not to invalidate the creation of the SEBP, even though it contends that Miniace and McMahon were without authority to create the SEBP. By seeking only to invalidate the 2002 Amendment, PMA seeks the benefit of the SEBP, and specifically the financial windfall created by McMahon's death, even though PMA has been fully reimbursed for its outlays and in fact received $162,037 more than what it paid towards McMahon's SEBP. The Court finds that while Miniace and McMahon breached their duties both with respect to the creation of the SEBP and the 2002 Amendment, because the Board was also negligent in its duties, equity does not require the invalidation of the 2002 Amendment. In addition, the Court does not invalidate the Amendment because the Amendment was not inconsistent with the intent of the SEBP and did not upset PMA's expectation of the amount it would have received upon McMahon's retirement. Finally, the Court finds it is equitable that McMahon's widow, Jeanette Coburn, retain McMahon's death benefit because PMA has already been made whole and there is no evidence of impropriety on Coburn's part.

### FINDINGS OF FACT

**Parties**

PMA is a nonprofit mutual benefit corporation whose members are maritime shipping carriers, terminal operators, and stevedore companies that service the ports along the West Coast. PMA's status as a tax-exempt organization under Section 501(c)(6) of the Internal Revenue Code requires that it qualify as a "[b]usiness league . . . not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(6). PMA's principal functions are to negotiate and administer the collective bargaining agreements on behalf of its member

United States District Court
For the Northern District of California

companies with the International Longshore and Warehouse Union ("ILWU") covering the terms of employment of ILWU dockworkers employed by PMA members at West Coast ports. Joint Undisputed Fact ("UF") No. 1.

Joseph Miniace served as PMA's Chief Executive Officer ("CEO") from May 1996 until March 2004. UF No. 3.

Tom McMahon began employment at PMA on August 1, 1982, as Vice-President of Administration and Finance. McMahon's title was later changed to Senior Vice President, Finance and Administration. For most of McMahon's career at PMA, McMahon served as PMA's Chief Financial Officer ("CFO"). UF No. 5. At all times relevant to this litigation, until he died, McMahon was married to Jeanette Coburn. UF No. 6.

Michael Corrigan is an insurance broker and executive benefits consultant who provided insurance and related consulting services to PMA. UF No. 7.

**Structure of PMA and Delegation of Responsibilities for Compensation and Benefits**

PMA's Board of Directors is vested with the authority to exercise, conduct and control the powers and business of PMA, including setting officer compensation. Ex. 515 & 544. PMA's Board of Directors consists of senior executive officers of a number of PMA's member companies. Miniace testified and the Court finds that because PMA's member companies are competitors, it was a difficult structure to work within due to the fact that the members often had different, and competing, interests. In addition, because PMA's primary functions were negotiating and administering collective bargaining agreements on behalf of its member companies, members of the PMA Board did not focus on PMA's own structure or on internal PMA issues.

Until the Board of Directors amended the PMA Bylaws in December 2001, the Executive Committee had the delegated authority to exercise the power of the Board of Directors, including setting executive compensation. Ex. 515; *see also* Ex. 47, 61, 66, 68, 520, 524, & 526-530. Under the PMA Bylaws, no individual member of the Executive Committee was granted the authority to make decisions vested in the Executive Committee, including decisions regarding executive compensation, without the consent of the Executive Committee. Ex. 515.

**United States District Court**
For the Northern District of California

1    In addition to its responsibilities for determining executive compensation, the Executive

2 Committee periodically made decisions with regard to significant executive benefits.  In 1988, Michael

3 Wasacz of the Executive Committee sent a letter to William Coday, then-CEO of PMA, informing him

4 that the Executive Committee agreed to provide an annual retirement benefit in an amount equal to 40%

5 of his final 5 year annual compensation (base salary and any bonuses).  The letter states that "[t]he

6 Executive Committee, acting on behalf of the Board of Directors of the Pacific Maritime Association,

7 yesterday approved the following agreement . . . ."  Ex. 47.  In 1996, Mulholland sent Coday a letter

8 informing him that "[t]he majority of the members of the Pacific Maritime Association, Coast Executive

9 Committee met in a special executive session on December 17th and voted in favor of increasing W.E.

10 Coday's post-employment payment. . . . The Committee believes that taking such an action is a sound

11 business decision and in the best interest of PMA."  Ex. 68.  In 1998, the Executive Committee

12 considered and approved a matching contribution to the PMA staff 401(k) plan of 50% for fiscal year

13 1997-1998. Ex. 525.  The Executive Committee also considered and approved a change from a defined

14 benefit pension plan to a defined contribution plan.  *See* Testimony of Hemingway, Tilden & Epperson.

15    During Miniace's tenure as CEO, neither PMA's Executive Committee nor the Compensation

16 Committee ever assumed responsibility for such executive benefits as country club memberships,

17 company cars and personal allowances, vacation policy, or severance policy.  Ex. 844; Hemingway &

18 Scioscia testimony.

19    In the late 2000 to early 2001 time period, PMA restructured the Board and eliminated the

20 Executive Committee.  The Board at that time established a Compensation Committee.  *See* Testimony

21 of Hemingway & Miniace.

22    Miniace reported annually (first, to the Executive Committee and, later, to the Compensation

23 Committee) on matters of executive compensation.  Miniace and McMahon provided the Executive

24 Committee, and later the Compensation Committee, with information regarding compensation received

25 by PMA's senior executives and with recommendations for annual bonuses and compensation

26 adjustments.  *See* Expert Report and Declaration of Jesse H. Choper.

27    Before PMA fired Miniace in 2004, there was no written description of the role of the

28 Compensation Committee.  *See* Scioscia testimony; Ex. 844.  After PMA fired Miniace in 2004, PMA

drafted a written description of the role of the Compensation Committee; that description states, *inter alia*, that the Compensation Committee will "Review and approve PMA compensation and fringe benefit policies . . . Annually review and approve for recommendation to the Board of Directors the compensation (including bonus levels) and fringe benefits of the CEO and SVPs . . . [and] For each V.P. and above, review annual written certification of all compensation & fringe benefits.  Such certification must be signed by employee confirming that all compensation and fringe benefits are included. "  Ex. 844 at Ex. 304 at PMA 15243; Scioscia testimony.

### Approval, Selection and Design of the Secured Executive Benefit Plan

Miniace testified that during the summer of 1996, he discussed with Mulholland the need to create some type of retirement package to provide Miniace with retirement income.  Mulholland testified that he did not recall hearing about, discussing or considering a supplemental retirement plan for a group of PMA executives while he was on the Executive Committee.

Miniace and McMahon selected Corrigan to assist them in developing and implementing a plan to provide supplemental retirement benefits for certain PMA senior executives.  Ex. 101.  Corrigan assisted McMahon with the creation of a request for proposals ("RFP") for supplemental retirement benefits plans.  *Id.*  On August 13, 1996, PMA sent out the RFP for supplemental retirement benefits plans.  Ex. 81 & 96.  The RFP states, *inter alia*, that "Pacific Maritime Association intends to install a non-qualified supplemental retirement plan which has been designed to benefit four senior employees."  Ex. 96 at COOK 1298.[1]  The "Design Specifications" listed in the RFP included the requirement that any proposed retirement plan must "[o]ptimize income to executives."  Ex. 96 at COOK 1300.

In response to the RFP, Corrigan submitted a proposal for the "Secured Executive Benefit Plan" ("SEBP").  *Id.* at COOK 1301-1330.  Corrigan's proposal states, *inter alia*, that his proposal contained savings that "will ultimately be reflected in superior values and greater retirement income for the participants."  *Id.* at COOK 1301-1302.  PMA also received proposals from Mullin Consulting and Peter M. Peck, CLU & Associates.  Ex. 101.  Miniace and McMahon selected Corrigan's proposal.  *Id.*

---

[1]  "COOK 1298" and similar references are to Bates-stamped trial exhibits.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

Prior to adopting the SEBP, McMahon and Corrigan met with Jeffrey Milstead of the Capital Planning Group to discuss tax and accounting issues related to the SEBP, Big Six accounting firm reviews of the SEBP, and other topics. *See* Milstead testimony. With his letter dated October 6, 1996, Milstead sent PMA draft documentation relating to the SEBP, including the master plan document with attachments for each participant and a sample resolution. UF No. 9.

On or about November 14, 1996, and December 5, 1996, Miniace and McMahon signed papers creating the PMA SEBP. Ex. 94 & 30. On November 14, 1996, Mulholland signed the "Committee Resolution" ("the Resolution") authorizing implementation of the SEBP. The Resolution states that it was adopted by the Executive Committee. Ex. 70. The Resolution states, *inter alia*,

> [T]hat the Plan, which consists of the plan document, the agreement, the endorsement, and the schedule of premiums and projected benefits, all of which have been presented at this meeting, and the insurance policy, is hereby approved and adopted by the Association and that those officers of the Association who are authorized by law to take action on behalf of the Association on such matters be, and hereby are, authorized and directed to execute all documents and to take all steps to effectuate the Plan on behalf of the Association.

*Id.* The Resolution also states that "the Association reserves the right to amend or terminate the Plan at any time and from time to time." *Id.*

The SEBP states that it "is intended to be an employee welfare benefit plan under Section 3(1) of the Employee Retirement Income Security Act of 1974, as Amended ('ERISA')." Ex. 30. The Plan also states that "[t]he named fiduciary is Pacific Maritime Association," and it names the CFO of PMA as the Administrator of the Plan. *Id.*

Miniace, McMahon, Edward Kovach, Terry Lane, Charles Wallace, Philip Resch, Craig Epperson, and Paul Holmes were all participants in the SEBP. UF No. 10; Ex. 842. Miniace and McMahon received by far the largest benefits under their SEBPs. Ex. 567. On April 16, 1997, Miniace signed a Corporate Resolution enrolling Coday in the SEBP. Ex. 32.

The SEBP was a reverse split-dollar life insurance plan. *See* Testimony of Corrigan, Brody & Harris. Under the SEBP, PMA purchased life insurance on the lives of the participating executives and made premium payments exceeding the actual cost of the insurance charged in the policy, resulting in a rapid build-up of cash value in the life insurance policies. This accumulated cash value was invested to fund supplemental retirement income for the executives upon their retirement in the form of tax-free

loans or withdrawals. For tax reasons, until the participant retired and PMA's contributions to the SEBP ceased, the death benefit payable upon a participant's death had to be shared by PMA and the executive's beneficiaries. The SEBP identified the portion of the death benefit payable to PMA as the "Recoverable Amount," which in turn was defined as the total death benefit payable less the Accumulation Value. Ex. 30.

The SEBP life insurance policies on each executive's life were comprised of two types of policies: (1) a universal life policy, which was designed to quickly build up cash value or "accumulation value" for the executive to have available as tax-free income upon his retirement; and (2) a term insurance rider to the universal life policy ("the term rider"), the purpose of which was to permit PMA to minimize the income imputed to the executive from his share of the premium payments that PMA made. *See* Brody & Milstead testimony. During the executive's employment with PMA, the executive assigned to PMA all of the term rider death benefits and a portion of the universal life death benefits. *See* Harris, Milstead & Brody testimony. The reason for this assignment was to prevent PMA's payments for the executive's SEBP policies from being added as imputed income to the executive's taxable income. Absent the assignment to PMA, the executive would have been subject to income tax on the full amount of the premiums that PMA paid for the executive's SEBP policies.

The principal purpose of the SEBP, as contemplated by Miniace and McMahon, was to build cash value to fund supplemental retirement income for themselves and the other PMA senior executives whom Miniace and McMahon invited to participate. *See* Testimony of Brody, Corrigan, Epperson, Harris, Milstead, & Falkenstein. The SEBP states that "The primary purpose of this Plan is to attract and retain qualified personnel by the Association's assisting the Participants in paying for life insurance benefits." Ex. 30.

The stated secondary purpose of the SEBP was to "maintain key person life insurance protection with respect to the Participants." Ex. 30. In reality, however, the intent of the SEBP was to provide retirement income to the senior PMA executives participating in the Plan, and not to benefit PMA. *See* Testimony of Brody, Corrigan, Epperson, & Harris; Ex. 500. The death benefit purchased by PMA under the SEBP was intended as a means of facilitating the rapid build-up of the life insurance policies' Accumulation Value. With true key person insurance, an analysis is done to determine the amount of

United States District Court
For the Northern District of California

losses an employer would incur if the executive died.  No calculations were ever performed to determine the economic value to PMA of the executives participating in the SEBP.  *See* Testimony of Harris & Miniace; Ex. 18.

Upon retirement of an SEBP participant, the SEBP contemplated that PMA would drastically decrease the amount of its interest in the retiring employee's SEBP death benefits by terminating the term riders that provided the bulk of the death benefits and reducing the face value of the universal life policy.  Upon the executive's retirement and termination of the term rider, the amount of PMA's Recoverable Amount would be reduced by the millions of dollars of the term rider death benefits that had previously been assigned to it.  After an executive retired or his employment was otherwise terminated, PMA would not receive the term rider death benefits.  *See* Testimony of Corrigan, Milstead, & Brody; Ex. 816.

PMA's tax exempt status under Section 501(c)(6) of the Internal Revenue Code required careful attention to the inurement rules governing executive compensation; excessive executive compensation could jeopardize PMA's tax exempt status.  A further incentive for Miniace in establishing the SEBP was the fact that, because it was characterized as a "benefit," and not salary or bonuses, PMA did not report the SEBP on its non-profit federal income tax return, the Form 990. Ex. 13 & 14.  In fiscal year 2003, after PriceWaterhouseCoopers recommended doing so, PMA disclosed for the first time on its Form 990 the value of officers' benefits such as the reverse split-dollar insurance. Ex. 14.  PMA also amended its returns for open years to include this information.  *Id.*

**Funding the SEBPs**

On or about December 5 and 30, 1996, Miniace and McMahon caused PMA to pay a total of $535,000 as PMA's initial contribution to the SEBP.  The payments were made to SEBP life insurance carriers, American General Life Insurance Company and Chubb Life Insurance Company. Ex. 567, 83, & 84.  Between December 1996 and January 2004, PMA paid in excess of $4 million to fund the SEBP for PMA senior executives.  PMA paid $1,250,601 between December 1996 and January 2004 to fund Miniace's SEBP; $824,346 to fund McMahon's SEBP; $540,200 to fund Epperson's SEBP; $400,000 to fund Resch's SEBP; $350,000 to fund Wallace's SEBP; $250,000 to fund Lane's SEBP; $125,000

United States District Court
For the Northern District of California

to fund Holmes' SEBP; and $50,000 to fund Kovach's SEBP.  Ex. 567.

McMahon paid at least $122,917 of his own SEBP premiums by deferring salary.  Ex. 842, Stipulated Fact.  Miniace paid at least $116,564 of his own SEBP premiums by deferring bonuses.  Ex. 842, Stipulated Fact.

**Disclosure to the Board**

Miniace had the duty to bring special employee benefits which affected only a select number of senior executives to the Board for review, particularly benefits that enlarged his own package.  Miniace and McMahon did not fully and accurately disclose the details of the SEBP to Mulholland or the Executive Committee at the time the Plan was put in place in 1996.  Miniace testified that Mulholland did not read the 1996 Resolution before signing it, and did not read it at the time of signing it.  Miniace also testified that, at the time he gave Mulholland the Resolution to sign, Miniace did not discuss how much the Plan would cost PMA or how much would specifically be put into Miniace's individual plan. Various members of the Executive Committee testified credibly that they were never informed about the creation of the SEBP or key person insurance.  *See* Testimony of Jones, Hemingway, Tilden, Raymond, & Scioscia.

Miniace and McMahon also did not fully and accurately disclose the SEBP to the Executive Committee at any time after the Plan was put into place.   Miniace and McMahon failed to disclose to the PMA Board or any Board Committee the amounts of money PMA paid in SEBP premiums for either themselves or other PMA executives. Ex. 14, 15, 16, 70, & 72; Miniace testimony.

Instead, several documents referenced or alluded to the SEBP without ever fully explaining what the SEBP was, how it worked, or how much the Plan cost.  For example, on April 30, 1997, McMahon provided PMA's Finance Committee with a memorandum which explained that the variance between PMA's fiscal year 1996-1997 budget and PMA's estimated actual expenses for that year was the result, in part, of the implementation "of a Supplemental Plan approved by the Executive Committee for those key employees affected by the most recent cutback in pension contributions by the Federal Government."  Ex. 72 at PMA 7411.  The memorandum does not provide any information about the Supplemental Plan, and misleadingly states that the Executive Committee approved the Plan.

However, the Executive Committee was negligent by failing to question Miniace or McMahon regarding the SEBP, despite having some notice of the Plan in the form of Mulholland's conversations with Miniace and signing of the 1996 Resolution; the Executive Committee's receipt of McMahon's April 30, 1997 letter; the fact that PriceWaterhouseCoopers, PMA's auditors, noted the budget variance that was due to the SEBP payments in PMA's financial statements for 1996, *see* Kearney testimony; and the fact that payment to Resch's SEBP is explicitly included in Resch's Departure Agreement, dated September 17, 1999, and executed by Epperson. Ex. 8 at PMA 4174 ("Employer shall make a payment on behalf of Employee into Employer's Supplemental Benefit Plan for 1999 . . . . It is understood and agreed by the Parties that Employee may seek information from Michael Corrigan regarding his rights and interest in such Plan and that Employee's said rights and interest shall be determined by the terms of the Plan and law. . . .").

**2002 Amendment of the SEBP**

On March 28, 2002, McMahon was diagnosed with pancreatic cancer. McMahon retired from PMA on April 30, 2002, and died on May 3, 2002. In anticipation of McMahon's death, in early April 2002, Miniace signed an amendment to the SEBP and, along with McMahon, signed documents to amend McMahon's SEBP ("SEBP Amendments"). Although signed in April, the amending documents were back-dated to January 15, 2002. Ex. 34, 41, 97, 294, & 295; Testimony of Miniace, Corrigan, & Falkenstein.

The SEBP Amendment changed the definition of the "Recoverable Amount" to which PMA was entitled from death benefit less the cash value to cash value only. Ex. 41, 294 & 295. The SEBP Amendment was not inconsistent with the original intent of the SEBP, as it was always intended that upon the termination of an SEBP participant's employment, PMA would release its interest in the death benefits and the participant would have full control over the policy, including the right to access the policy cash values for supplemental retirement income. *See*, *e.g.*, Ex. 18, 816 at Ex. C. Indeed, PMA's expert Brody opined in his original report that the 2002 Amendments to the SEBP were unnecessary because "at [McMahon's] retirement, PMA's entitlement to any part of the death benefit would have terminated." Ex. 816 at Ex. C, p. 5.

1     Miniace testified that he mistakenly believed that the 2002 Amendment to the SEBP would

2     affect all SEBP participants.  However, while the Amendment Miniace signed applies to the entire Plan,

3     paperwork to amend the individual participant agreements and endorsements was prepared and signed

4     only for McMahon, not for any of the other SEBP participants.  Miniace received no benefit as a result

5     of the 2002 Amendment to the SEBP.  *See* Testimony of Brody & Corrigan.

6     No PMA executive or executives had the authority to amend the SEBP in the manner reflected

7     in the 2002 SEBP Amendments without the knowledge and approval of the PMA Board or designated

8     Committee.

10   **IRS Notices and 2003 Termination of the SEBP**

11     On January 28, 2001, the IRS issued Revenue Notice 2001-10.  Revenue Notice 2001-10 stated

12   that "[t]his notice clarifies prior rulings issued by the IRS regarding the taxation of split-dollar

13   arrangements, provides taxpayers with interim guidance on the tax treatment of split-dollar

14   arrangements pending publication of further guidance, and requests taxpayer comments on the interim

15   guidance and a number of unresolved issues."  Ex. 816A, Ex. A.  The Notice announced that after

16   December 31, 2001, the P.S. 58 Table that previously was used to calculate the premium to be paid by

17   the employer could no longer be used for any split-dollar plan, whether new or already in existence.

18   After December 31, 2001, a new table, Table 2001, which was based on current mortality and interest

19   assumptions, had to be used.

20     On January 3, 2002, the IRS issued Revenue Notice 2002-8.  Notice 2002-8 "[a]nnounces that

21   the Treasury and the Service intend to publish proposed regulations providing comprehensive guidance

22   regarding the Federal tax treatment of split-dollar life insurance arrangements; [o]utlines rules expected

23   to be included in the forthcoming proposed regulations and the expected effective date of those

24   regulations; and [p]rovides guidance regarding the valuation of current life insurance protection under

25   a split-dollar life insurance arrangement, under qualified retirement plans and under employee annuity

26   contracts."  Ex. 816A, Ex. B.  Revenue Notice 2002-8 revoked Revenue Notice 2001-10, but kept the

27   new Table 2001 and revoked the use of the P.S. 58 Table for reverse split-dollar plans.

28     Neither Revenue Notice 2001-10 nor Revenue Notice 2002-8 required the 2002 SEBP

United States District Court
For the Northern District of California

Amendment.  However, Corrigan testified that beginning in late 2001, McMahon and Corrigan discussed options for amending the SEBP in light of Revenue Notice 2001-10 and the expectation that the final regulations to be adopted by the IRS would effectively eliminate the tax advantages of plans such as the SEBP and render them no longer economically viable.

On August 16, 2002, the IRS issued Revenue Notice 2002-59.  Notice 2002-59 contained definitive guidelines related to split-dollar plans which adversely impacted the tax treatment of the SEBP and other similar programs.  In response to these guidelines, PMA terminated the SEBP in 2003.  In 2003, PMA signed releases of PMA's interest in participants' SEBPs, including Miniace's SEBP, to facilitate PMA's transition out of the SEBP.  Ex. 573 & 96; Corrigan testimony.

PMA has released most or all of its interest in the death benefits of all of the original SEBP participants other than McMahon, including Kovach (Ex. 808), Lane (Ex. 809), Wallace (Ex. 803), Resch (Ex. 810, Page-Wilson testimony 749:13-17), and Miniace (Ex. 181).  PMA has not taken any actions to recover its rights to these released benefits, except in Miniace's case.  *See* Testimony of Corrigan & Page-Wilson.

In 2003, PMA executed new supplemental retirement plans for senior executives.  Ex. 119 & 120.  Under the plan for Epperson, PMA will recover, at most, only its premiums upon Epperson's death.  Ex. 120 at ¶ 1.13; Epperson testimony.  Under Maritech's Supplemental Executive Retirement Plan for PMA's current CEO, Senior Vice President James McKenna, and PMA's current CFO Michael Wechsler, the death benefits go to the participants' designated beneficiary, not to PMA or Maritech.  Ex. 119 at ¶ 6.02.

**Payout of McMahon's SEBP and Miniace's Termination**

Coburn received death benefits totaling $10,131,629 from McMahon's SEBP; if McMahon's SEBP had not been amended, Coburn would have received $986,383 from the SEBP.  Upon McMahon's death, PMA received $986,383, which amounted to $162,037 more than what PMA had paid towards McMahon's SEBP.

Coburn received an additional $2,281,000 in retirement, life insurance, and other cash benefits from PMA in connection with McMahon's retirement and death.

United States District Court
For the Northern District of California

1    PMA terminated Miniace on March 17, 2004.

2

3    **CONCLUSIONS OF LAW**

4    The Court makes the following general observations regarding this case.  As senior officers of

5    PMA, Miniace and McMahon owed PMA a fiduciary duty.  Miniace and McMahon breached these

6    fiduciary duties when they established the SEBP without fully and accurately disclosing the SEBP to

7    the Board of Directors, or the appropriate Board committee.  The Court finds unpersuasive Miniace's

8    argument that because the SEBP was a "benefit," and not a salary or a bonus, the SEBP did not need

9    to be fully and accurately disclosed to the Board of Directors.  The SEBP was intended to provide

10   Miniace, McMahon and other participating senior executives with significant retirement income, and

11   it required a significant financial outlay from PMA.  As such, it is not accurate to characterize the SEBP

12   as a *de minimis* fringe benefit.  The impropriety of Miniace's conduct is accentuated by the facts that

13   (1) he prepared the Board packets and set the agenda for, attended, and presided over Board meetings

14   and (2) he was responsible for reporting to the Board's Executive Committee (and later, its

15   Compensation Committee) regarding executive compensation.

16   Miniace and McMahon further breached their fiduciary duties to the PMA when they funded the

17   SEBP without disclosure to, or approval from, PMA.  The same holds true for the 2002 Amendment to

18   the SEBP; Miniace and McMahon amended the SEBP in order to ensure that McMahon's beneficiaries

19   would receive his death benefit, and they did not disclose the amendment to PMA.  However,

20   throughout the entire relevant time period, the Board was also negligent in failing to provide sufficient

21   oversight of, or otherwise investigate, the actions taken by Miniace and McMahon with respect to the

22   SEBP.

23   PMA has brought numerous ERISA claims against Miniace and Coburn.  The SEBP is an

24   ERISA plan.  By virtue of his role in the creation of the SEBP, Miniace is a fiduciary of the Plan.

25   Indeed Miniace concedes, as he must, that he is an ERISA fiduciary; to do otherwise would be

26

27

28

inconsistent with his claim that he had the authority to create, fund, and amend the SEBP.[2]  For the same reasons, McMahon was a fiduciary of the Plan.  In addition, the SEBP specifically provides that the CFO is the administrator of the Plan.

As ERISA fiduciaries, Miniace and McMahon generally owed a fiduciary duty to participants and beneficiaries.  *See* 29 U.S.C. § 1104(a)(1).  The ERISA construct does not neatly fit the facts of this case because PMA is not a participant under the Plan, and it is unclear whether PMA is a "beneficiary."  The SEBP refers to, and distinguishes between, "the Association" and "beneficiaries," and thus it is unclear whether PMA is a "beneficiary" of the Plan.  *See* Ex. 30 ¶ 5.1 ("In the event that the Insurance Policy matures as a death claim while the Agreement remains in force, the Association shall be entitled to claim from the proceeds payable thereunder the Recoverable Amount payable under the Insurance Policy.  The balance of such proceeds shall be paid to the beneficiary designated by the Participant pursuant to the terms of the beneficiary provisions in the Insurance Policy.").

However, ERISA defines the term "'beneficiary' [as] a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."  29 U.S.C. § 1002(8)   The Court finds that, although the ERISA framework does not comfortably fit, because PMA was designated by the terms of the SEBP as an entity that "is or may become entitled to a benefit thereunder," PMA is akin to a "beneficiary" to whom Miniace and McMahon owed a fiduciary duty under ERISA.  Further, PMA is named as a fiduciary of the SEBP.  PMA has brought its ERISA claims under Section 502(a)(3) of the Act, which permits fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).  Thus, even if PMA is not technically a "beneficiary" under ERISA, PMA may seek equitable relief under this catch-all provision.

The Court concludes that when they created the SEBP, Miniace and McMahon were not acting

---

[2]  PMA's contention that Miniace is an ERISA fiduciary by virtue of the authority he exercised over the SEBP is in direct tension with its claim that he was without authority to create and fund the SEBP.  Similarly, PMA's argument that Miniace and McMahon had no authority to create or fund the SEBP is inconsistent with its desire to invalidate only the 2002 amendment to the Plan, thereby recovering McMahon's death benefit and the accumulated cash value of Miniace's SEBP.

in a fiduciary capacity under ERISA.  *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 77 (1995).  Further, PMA's ERISA challenge to the funding of the SEBP fails.  *See id.* (*citing Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90-91 (1983)).  Instead, these actions are more fairly characterized as settlor functions, not fiduciary activities.  *Id.*  Moreover, by creating the SEBP, and causing PMA to fund the SEBP, Miniace and McMahon did not harm PMA *as an ERISA beneficiary*.  While these actions may have caused harm to PMA *as a company*, they did not cause any injury to PMA in its role as beneficiary under the SEBP.

In contrast, the Court finds that with respect to the 2002 Amendment of the Plan, Miniace and McMahon were acting as ERISA fiduciaries, and that they breached those duties.  As ERISA fiduciaries, Miniace and McMahon had a duty of loyalty to deal fairly and honestly with plan beneficiaries, including PMA in its capacity as the assignee of benefits under McMahon's SEBP.  *See Farr v. U.S. West Commc'ns, Inc.*, 151 F.3d 908, 915 (9th Cir. 1998) ("[T]he ERISA fiduciary duty includes the common law duty of loyalty, which requires fiduciaries to deal fairly and honestly with beneficiaries.").  As ERISA fiduciaries who were also PMA officers and participants in the SEBP, Miniace and McMahon had a heightened duty to avoid conflicts of interest.  *See Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142-43 (1985) ("the avoidance of conflicts of interest" is among the primary statutory duties imposed upon ERISA fiduciaries).  Miniace and McMahon breached their duties because they altered the terms of the SEBP so as to reduce PMA's recovery and increase the recovery to McMahon's beneficiaries.

PMA has asserted five claims under ERISA against Miniace and/or Coburn.[3]  PMA has brought each claim pursuant to Section 502(a)(3), and seeks various forms of discretionary equitable relief.  *See Landwehr v. DuPree*, 72 F.3d 726, 738 (9th Cir. 1995).  With the above framework in mind, the Court

---

[3] On May 18, 2006, PMA filed a motion to amend its counterclaims to assert a proposed thirtieth claim for relief against Miniace, and a proposed thirty-first claim for relief against Miniace and Coburn. The Court GRANTS the motion to amend as to the proposed thirtieth claim for relief.  However, for the reasons set forth in this order, the Court concludes that PMA is not entitled to the equitable relief sought under that claim.  The Court DENIES PMA's motion to amend  to add the proposed thirty-first claim as unnecessary.  PMA states that this new claim is required to provide the necessary factual predicate to PMA's fifteenth claim for relief against the Corrigan defendants.  However, PMA's first through four ERISA claims already provide this factual predicate, and thus the proposed thirty-first claim is surplusage.

1   now analyses each claim.

2

3   **I.      PMA's First Claim for Relief Against Coburn**

4          PMA has pled its First Claim for Relief as one for equitable relief under ERISA Section

5   502(a)(3), 29 U.S.C. § 1132(a)(3).   The elements of the claim are: (1) proof of fraud or serious

6   wrongdoing, which includes a breach of fiduciary duty to a beneficiary, (2) Coburn has received a

7   benefit, (3) at PMA's expense, and (4) as between Coburn and PMA, it is unjust for Coburn to retain

8   the benefit. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260 (1993); Restatement (First) of Restitution

9   § 1 & cmts. a, b & c (1937); *see also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204

10  (2002) (interpreting scope of equitable relief under ERISA Section 502(a)(3) by reference to, *inter alia*,

11  Restatement of Restitution).

12         The Court concludes that Miniace and McMahon breached their fiduciary duties under ERISA

13  when they amended the SEBP without disclosure to, and approval from, PMA.  The Court also finds

14  that the second element is met because Coburn received a benefit in the form of $10,131,629 in life

15  insurance proceeds.

16         However, PMA's claim fails on the third and fourth elements.  Coburn did not receive a benefit

17  at PMA's expense.  Although it is true that, absent the amendment, PMA would have received

18  McMahon's death benefit, it was never intended or contemplated that the SEBP would actually operate

19  in this manner.  If PMA had treated McMahon after his retirement in the same manner that it had treated

20  every other departing SEBP participant and released its interest in, or eliminated the term riders on,

21  McMahon's life insurance policies, PMA would have lost its right to the bulk of McMahon's death

22  benefits, regardless of the 2002 Amendments to the SEBP. It was intended and expected that upon a

23  participant's retirement, the participant would benefit from the SEBP by receiving significant retirement

24  income, and PMA's interest in the SEBP would substantially diminish.  Thus, PMA never had an

25  expectation that it would receive a participant's death benefits, or that it would receive any significant

26  amount of money as a result of the SEBP.

27         Finally, the Court finds that as between Coburn and PMA, it is not unjust for Coburn to retain

28  the benefit.  Coburn was not involved in the creation of the SEBP or the 2002 Amendments.  There is

**United States District Court**
For the Northern District of California

18

no evidence that Coburn acted improperly in any way.  Moreover, as a result of McMahon's death, PMA recovered $162,037 more than what it had paid towards McMahon's SEBP.  Ex. 127 and 842.  Thus, PMA did not suffer any out-of-pocket losses as a result of funding McMahon's SEBP, and indeed, PMA has financially benefitted from McMahon's death.

For the foregoing reasons, and as a matter of the Court's discretion, the Court DENIES PMA's first claim for equitable relief against Coburn.

**II.      PMA's Second Claim for Relief Against Coburn and Miniace**

PMA has pled its Second Claim for Relief as one for equitable rescission under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3).  PMA seeks an equitable decree rescinding the 2002 First Amendment to the SEBP (Exhibit 41), the McMahon Amended Endorsements (Ex. 294, 295), and the Miniace Certifications (Ex. 87).

"Under traditional contract law, an agreement can be rescinded when it is entered into on the basis of a fraudulent or material misrepresentation." *Sec. Life. Ins. Co. of America v. Meyling*, 146 F.3d 1184, 1191 (9th Cir. 1998).  "Rescission reverses the fraudulent transaction and returns the parties to the position they occupied prior to the fraud. It restores the status quo ante. Under true rescission, the plaintiff returns to the defendant the subject of the transaction, plus any other benefit received under the contract, and the defendant returns to the plaintiff the consideration furnished, plus interest." *Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment*, 189 F.3d 1017, 1031 (9th Cir. 1999).

The Court concludes that PMA's second claim for relief is not properly brought against Coburn, who was not a party to the SEBP and had no involvement in the 2002 Amendment.  With respect to Miniace, the Court concludes that equitable rescission is not "appropriate" equitable relief under Section 502(a)(3) for several reasons.  First, Miniace did not benefit from the 2002 Amendment, and there is no consideration for him to return to PMA.  Second, even if Miniace could rescind the 2002 Amendment – a matter which is questionable in light of the fact that he is no longer employed by PMA – it is not clear what effect, if any, such a rescission would have.  The insurance companies paid out McMahon's death benefits in 2002, and McMahon's SEBP no longer exists.

Third, for the reasons stated *supra*, the Court finds it would be inequitable to require Coburn to

turn over the insurance proceeds to PMA.  *See 20th Century Ins. Co. v. Liberty Mut. Ins. Co.*, 965 F.2d 747, 758 (9th Cir. 1992) ("[T]here can be no rescission where the rights of third parties would be prejudiced.") (internal citation and quotations omitted).  The Court also finds that it is difficult to determine what the "status quo ante" would be in the case. While Miniace and McMahon amended the SEBP in 2002 because of McMahon's imminent death and not because of the IRS interim guidance, it is also true that the SEBP would have been amended at some point due to the IRS regulations.  Once the IRS issued definitive guidelines regarding split-dollar plans, PMA terminated the SEBP and established new Supplemental Executive Retirement Plans under which the death benefits go to the participants' designated beneficiaries, not PMA.

For the foregoing reasons, and as a matter of the Court's discretion, the Court DENIES PMA's second claim for relief against Coburn and Miniace.

## III.   PMA's Third Claim for Relief Against Coburn and Miniace

Although PMA did not submit proposed findings regarding this claim, PMA has pled its Third Claim for Relief as one for equitable reformation.  PMA seeks an equitable decree reforming the SEBP to conform to the terms and intent of the original 1996 Plan document.

> If a party's manifestation of assent is induced by the other party's fraudulent misrepresentation as to the contents or effect of a writing evidencing or embodying in whole or in part an agreement, the court at the request of the recipient may reform the writing to express the terms of the agreement as asserted,
> (a) if the recipient was justified in relying on the misrepresentation, and
> (b) except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

Restatement (Second) of Contracts § 166 (1981). "[S]ince the remedy is equitable, a court has the discretion to withhold it, even if it would otherwise be appropriate, on grounds traditionally considered by courts of equity in exercising their discretion." *Id.* at cmt. a.

For all of the reasons stated *supra* with respect to PMA's claim for equitable rescission, the Court concludes that equitable reformation is not appropriate.  The Court further finds that equitable reformation is not warranted because, although Miniace and McMahon amended the SEBP without full and accurate disclosure to PMA, the 2002 Amendment does not reflect a mistake on PMA's part, nor is it fairly characterized as a fraud by Miniace or McMahon.  Accordingly, the Court DENIES PMA's

1    third claim for relief.

2

3    **IV.    PMA's Fourth Claim for Relief Against Coburn and Miniace**

4            PMA has pled its Fourth Claim for Relief as one for declaratory relief under ERISA Section

5    502(a)(3).  PMA seeks a declaration from the Court that the 2002 First Amendment to the SEBP

6    (Exhibit 41), the McMahon Amended Endorsements (Exhibits 294, 295), and the Miniace Certifications

7    (Exhibit 87) are legally invalid.

8            For the reasons stated *supra* with regard to PMA's other claims, the Court DENIES PMA's

9    fourth claim for relief against Coburn and Miniace.

10

11   **V.    PMA's Thirtieth Claim for Relief against Miniace**

12           PMA's has pled its Thirtieth Claim for Relief as one for equitable relief under ERISA Section

13   502(a)(3). PMA asserts that Miniace caused PMA to pay $1,250,601 in premiums for Miniace's SEBP,

14   and Miniace has been unjustly enriched by his receipt of the value of the SEBP policies, including their

15   accumulated cash value.  PMA seeks the following:

16           [A] constructive trust on Miniace's rights and benefits in his SEBP policies, in whatever
             form they currently exist, an accounting of Miniace's disposition of his rights and
17           benefits in his SEBP policies, an accounting of any profits made by Miniace from his
             rights and benefits in his SEBP policies, an order directing Miniace to transfer his rights
18           and benefits in his SEBP policies to PMA in whatever form they currently exist,
             imposition of an equitable lien giving PMA a security interest in Miniace's rights and
19           benefits in his SEBP policies in whatever form they currently exist . . . .

20   PMA's Third Amended Counterclaims and Cross-Claims ¶ 166.

21           The Court finds that because Miniace did not violate his fiduciary duties under ERISA with

22   regard to the creation or funding of the SEBP, PMA is not entitled to the relief sought.[4]  Miniace only

23   breached his ERISA fiduciary duties when he amended the Plan in 2002; however, that amendment did

24   not affect Miniace's SEBP, and has no bearing on the thirtieth claim for relief.  Further, the Court notes

25   that because the 2002 Amendment did not affect Miniace's SEBP, to the extent Miniace's policies exist,

26   _____

27           [4]    The Court also notes that PMA released its rights to Miniace's SEBP in 2003.  The record
     before the Court is unclear as to the specific circumstances of that release, and whether PMA's release
28   was full and unequivocal.

United States District Court
For the Northern District of California

it would appear that Miniace is similarly-situated to the other original SEBP participants; PMA has released its interests in all of these other plans, and has not sought to recover any amounts related to the SEBP from any of these other participants.  This is an additional factor weighing against equitable relief.

### CONCLUSION

For the foregoing reasons, the Court DENIES PMA's ERISA claims, and GRANTS in part and DENIES in part PMA's motion to amend.  (Docket No. 400).

**IT IS SO ORDERED.**

Dated: March 30, 2007

SUSAN ILLSTON
United States District Judge